MOSES CALL *versus* THOMAS W. CHADBOURNE.

The provisions of the Act of 1852, c. 243, (R. S. of 1857, c. 11, § 26,) are not unconstitutional. For, notwithstanding the Legislature had conferred upon towns the authority to establish school districts and fix the limits thereof, within their respective towns, its power upon the subject was not thereby exhausted, so that it could not legitimately empower districts, within a town, to unite, without the consent of the town.

Nor was that statute so far repealed by the Act of 1854, c. 104, § 1, (R. S., c. 11, § 1,) as to take away from school districts the authority to unite, which was conferred by it.

The provision of § 3, art. 2, of c. 193 of Laws of 1850, (R. S., c. 11, § 15,) that "every school district shall in all cases be presumed to have been legally organized, when it shall have exercised the franchise and privileges of a district for the term of one year," was intended to overcome all objections of a technical nature, on account of irregularities and informalities of proceedings in the organization of a district.

But such presumption will not be held to be conclusive; otherwise, it might exclude the right to show that the organization had been procured by fraudulent and corrupt practices.

REPORTED by RICE, J.

This was an action of TRESPASS, for taking certain personal

property belonging to the plaintiff. The defendant justifies as sheriff of the county of Lincoln, having in his hands for service an execution against the inhabitants of school district No. 6, in Dresden, and in execution of the command of said precept, he levied on the property.

The plaintiff denied that he was, or ever had been, an inhabitant of said district No. 6.

It was admitted that the proceedings of the defendant, in making the levy, were regular and according to law; also, that he was duly qualified to act as sheriff.

It was further agreed that, in the year 1826, the town of Dresden established two districts, — district No. 6, and district No. 3, — one on the eastern and the other on the western side of Eastern river.

The plaintiff, at the time of the levy, lived in that part of the town which was embraced in district No. 3, and had resided therein for at least ten years before. Those districts remained as they were established in 1826, until 1852.

On the 23d day of September, 1852, a meeting of school district No. 6 was held, pursuant to a warrant issued by James Bickford, Agent, on the written request of five inhabitants of said district No. 6. It was not questioned that said Bickford was duly elected agent for the year 1852, but it does not appear by the *record* that he was sworn.

The 2d article in the warrant was, " To see if the district will agree to unite with district No. 3, to form a new district to be called district No. 6, according to an Act passed by the Legislature, and approved by the Governor, April 9, 1852, and pass any vote or votes in relation to the same."

The action of the district under this article, is thus recorded: — " *Voted*, that district No. 6 be united to district No. 3."

On the 22d day of April, 1854, under a warrant issued by Aaron Bickford, on written application of three inhabitants of the district, a meeting of district No. 3 was holden, at which it was " voted to dismiss the 5th article," (relating to uniting with district No. 6.)

A part of the record of the meeting at which the agent was elected, is as follows:—" Chose Aaron Bickford School Agent and sworn."

On January 9, 1856, a meeting of the inhabitants of district No. 3 was held, under a warrant issued by the selectmen of the town of Dresden, written application having been made to them by certain of the inhabitants of the district.

Article 2d of the warrant was "to see if the district will vote to unite with school district No. 6, to form a new district to be called district No. 6, according to the Act passed by the Legislature and approved by the Governor, April 9, 1852, and pass any vote or votes in relation to the same."

The record of the doings of the meeting contains the following:—" Art. 2d. *Voted* to unite with school district number six, to form one district, to be called number six, according to the article in the foregoing warrant."

On the 10th day of January, 1856, the clerks of the school districts No. 6 and No. 3, certified the action of their respective districts to the clerk of the town, by whom they were entered upon the town records.

It was agreed that, in the year 1856, the selectmen of Dresden apportioned the school money to the union district No. 6, and that it was appropriated to the support of schools in the union district No. 6, kept during the years 1856 & 7, and that, in 1857, the money was apportioned to districts Nos. 6 & 3, by the selectmen, and the selectmen drew orders in favor of district No. 6 and district No. 3, for the amount of money so apportioned, and schools were kept in both districts. The agent of the union district also drew his orders on the town treasurer for the money apportioned to districts Nos. 3 & 6, and drew the same from the treasury, viz., $276,25, and expended it for schools kept in that district during the years 1857 & 8.

The union district was organized March 22d, 1856, as appears by the records of said district.

A school house was built in said union district by Ephraim Alley, 2d, during the summer of 1856, in which the schools

of said district have been since kept. A portion of the scholars of both districts have attended the schools in the union district ever since schools were kept there.

A portion of the voters in the old districts, Nos. 3 and 6, have attended and voted at all the meetings of the union district No. 6, claiming to constitute a union district, formed from the old districts Nos. 3 and 6, and a portion have never attended, claiming that said districts were not united.

All legal objections to the introduction of the 'facts and records above set forth are reserved to each party.

An Act of the Legislature, approved March 19, 1858, entitled " an Act to make valid the proceedings of school districts numbers three and six, in Dresden," makes part of the case.

It appears, from the case, that Ephraim Alley, in the year 1857, recovered judgment against the inhabitants of school district No. 6, for a school house which he had erected for them. The writ of execution, which was issued upon the judgment, was delivered to the defendant to be enforced. The amount of the judgment was assessed (as provided by statute) by the assessors of the town, on the inhabitants of the district. A portion of them neglecting to pay the sums which had been assessed upon them, the officer levied upon their property.

The plaintiff contends that his property was illegally taken, because he has never been an inhabitant of said district, but is an inhabitant of district No. 3, which has not been legally united with the other district.

*Morrill* and *Danforth,* for the plaintiff.

It is admitted that if, at the time of the levy, these two districts had legally become one, and that one legally called district No. 6, then plaintiff was an inhabitant of No. 6, and liable to have his property levied upon ; otherwise, he was not liable. These proceedings to unite the two districts, are undoubtedly intended to be founded upon the law of 1852, c. 243.

This law, we contend, is beyond the authority of the Legislature. By article 8th of the constitution of this State, the Legislature is authorized, and it is made its duty to compel *towns* to maintain public schools. This, it is believed, is the extent of its authority. So far as the compulsory power goes it is confined to towns. And, for the purpose of enabling towns more conveniently to perform the duty imposed upon them, the Legislature permits them to form districts, and, as a condition of the grant of this power, the Legislature gives such powers to the district, not inconsistent with the power of the towns, as it deems proper. By the law, as it existed at the time the statute of 1852 was passed, and as it was before and since, the towns had full power and control over the districts, to form, establish, change or annihilate them, as they chose; the Legislature simply defining the powers which districts might exercise when established. It is contended that, when this grant was made to the town, the Legislature had *exhausted its power* and could go no further. Otherwise, the Legislature could incorporate towns with powers, to a certain extent, exclusive over the territory incorporated, and then incorporate another body inside of that, with powers inconsistent with those given to the first; or give powers to a mere creature of the town, which make it stronger than the town itself.

All the statutes which have been enacted upon the subject, up to the one of 1852, seem to have contemplated districts as mere creatures of the towns, subject to their control, and simply to enable them conveniently to perform a duty.

But, in the law of 1852, power is given to the districts themselves to form other districts, taking from the towns all control over districts so formed; so that a district, instead of a creature of, and a convenience to towns, may, under that statute, acquire powers above and become burdensome to towns; and this too, when, theoretically, they are incidents to, and governed by, the officers of the town. In this very case it is claimed, that there is in Dresden a district beyond the power, and existing independent of the town, and yet re-

Call *v.* Chadbourne.

ceiving its sustenance from that very town; choosing its own agent, and that agent actually drawing, from the treasury of the town, money, the proceeds of a tax levied upon all inhabitants of the town. It is contended, then, that, for wise purposes, no power was given to the Legislature to form *such* school districts, and, much less, to enable districts, with such powers, to form themselves, and that, in the grant to the towns, the Legislature exhausted all the power they had.

But, whatever may have been the validity of the law, we contend that it was repealed by the law of 1854, c. 104. It is therein provided that towns shall have the entire control of districts, and all inconsistent Acts are repealed. It is certain that towns cannot have the exclusive control consistent with the law of 1852, which says that, in certain cases, they shall have no control. And we may well presume that the Legislature intended to repeal the law of 1852 ; for, if we compare that of 1854 with the statute of 1850, c. 193, art. 1, § 2, we shall find that the later is a reënactment of the former, with a slight change or addition at the end of the first section of the law of 1854. Now this reënactment would have been unnecessary, unless for the very purpose of repeal. Then, again, this addition to the law of 1854, is a confirmation of the above view. This addition makes it necessary, preliminary to a change in the alteration of the limits of school districts, to have the decision of the selectmen and school committee thereon, which decision was undoubtedly intended to take the place of the action of the districts, as provided in the law of 1852. This is the only ground on which the insertion of the whole of the first section, in the law of 1854, can be accounted for. In other parts of the same Act, it will be perceived that changes are made in the same manner. If repealed in 1854, then, at the time of the vote relied upon by defendant, in district No. 3, no law authorizing such a vote was in existence.

If the districts had power to unite, the proceedings are so fatally defective that the purpose was not accomplished. The first meeting, called for the purpose, was that of district No.

6, holden Sept. 23d, 1852, the very ground work of which fails. The notice was given by James Bickford, as agent, and no proof has been offered that he was sworn as required by the statute of 1850, c. 193, art. 2, § 10; and, until he was so qualified, he could not act as agent; and in no other capacity could he call a meeting. Laws of 1850, c. 193, art. 2, § 5. It is not enough that a meeting was holden. To be legal, it must have been legally notified. *Moor* v. *Newfield,* 4 Maine, 44.

Then, again, the article in the warrant, and the vote under it, were both insufficient. The article should state the purpose for which they are to vote. It simply says, " to see if the district will *agree* to unite with No. 6," &c., without saying for what purpose, except, " according to an Act," &c. Now there was no law authorizing districts to unite generally. Neither does it mend the matter by saying, " according to an Act approved by the Governor, April 9th, 1852," for it so happens that many Acts were approved on that day; and so no light is given as to the objects of the union. If the title to the Act had been given, it would have been some improvement; but it is respectfully suggested that the warrant should show the matter to be voted upon, the purposes to be accomplished, without looking further. Then, the vote is still more defective. By that, it is to be simply a union, but for what purpose does not appear.

Then comes the meeting of school district No. 3, holden Jan. 9th, 1856, relied upon by defendant as completing the union. There is the same objection to the warrant in this case, as in the former. Neither is there any legal return upon the warrant showing that notice was given.

It is further contended, that if each of these meetings were legal and the proceedings sufficient, still, taken both together, they do not accomplish the purpose. One was holden Sept. 23, 1852, the other, Jan. 9, 1856, nearly four years afterward. The law evidently contemplates that the action of the districts should be concurrent and cotemporary in point of time, or nearly so. The one is to be a proposition, the other an

Call *v.* Chadbourne.

acceptance. The situation of a district may essentially change, in the lapse of almost four years.

The vote of district No. 6 may have been passed under the peculiar circumstances existing at the time; as, for instance, the number of scholars in the district, or the want of repair of the school house, &c. And, when these circumstances ceased to exist, a union might be deemed to be inexpedient, on the part of district No. 6, while the change of circumstances may be the very consideration that would induce the other district to vote to unite. And the case shows that district No. 3, in the year 1854, was opposed to a union, but, in 1856, favored it.

But, further than this, we contend that the meeting in No. 3, April 22, 1854, was a complete answer to the one in No. 6. The proposition was rejected, and it was then as if nothing had been done. If No. 3 chose afterwards to have united, and voted to that effect in 1856, then certainly a meeting in No. 6 should have been called to accept or reject. As the matter now stands, one attempt to unite has failed; another has been made by one party only, and is nugatory until acted upon by the other.

Thus, the records not only do not show a concurrent action of the two districts, but really the opposite, that no such action has been had, and the defendant must fail, unless he shows it affirmatively, the burden being upon him.

Even a concurrent action of the districts is not sufficient. The clerks of the several districts must, by the law of 1852, § 2, forthwith furnish the town with a certified *copy of such votes*, which the town clerk is to record; and, from and after such record, such districts shall constitute one district, &c. This is not directory, simply, but is essential to the union. All school districts being an incident or constituent part of the town, and an important part of the system through which the town acts in supporting schools, it becomes necessary that the town records shall show the limits of the several districts. This, in fact, is the only guide which the town officers have in performing their duties to the schools. Hence the

law provides that, *only* from and after such record, the union takes place.  Now, it is contended, in this case, that no such return or record has been made.  In the case of No. 6, the person who claims to be clerk of something, but of what, whether of town, district, or something else, does not appear, certifies that the return is a copy, but, whether of a vote or mere statement of a fact, does not appear.  It certainly is not a copy of the record of the vote of No. 6, as will appear by comparing it with that record.  The return for No. 3 purports on the face to be the certificate of a fact, simply, and the attestation does not indicate any thing different, which is certainly insufficient, even if the statute did not expressly require a copy, as all these proceedings must be proved by the record or an attested copy.  *Moor* v. *Newfield,* 4 Maine, 44; *Owen* v. *Boyle,* 15 Maine, 147; *Maguire* v. *Sayward,* 22 Maine, 230.

The defendant, apparently aware of these defects and deficiencies, undertakes to ease them by proof of certain acts of individuals and town officers, to all of which we object.  We maintain that the union, if there is any, is to be proved by the records alone; and if, by those records, there is no union, none can be formed by municipal officers or individuals, whether acting as such or claiming to act in a corporate capacity. *Moor* v. *Newfield,* above cited.

Even towns, acting in a corporate capacity and recognizing districts already organized, and appointing agents for each district, do not, and cannot constitute districts legally established.  *Tucker* v. *Wentworth,* 35 Maine, 393.

But, in this case, the union was not recognized any more than denied.  The several districts kept up their organization, had their schools and received their money, as well as the union district.  While one portion of the people claimed that there was a union, and acted accordingly, another portion, and for aught that appears, a proportion equally as large or larger, deny the union, and act in accordance with that denial.  So that, in every particular, a repudiation of the union appears quite as plain as a recognition of it.

Call *v.* Chadbourne.

Neither does the organization of the alleged union district prove any thing. The law of 1850 declares that, when a district has exercised the franchise and privileges of a district for one year, its legal *organization* shall be presumed. But it does not say, its *legal existence* shall be presumed. Its establishment shall first be proved, then its organization may be presumed from its acts. It is, however, denied that, in this case, the union district did enjoy any franchise or privileges. Its existence was disputed. It was a mere association of individuals, claiming what was denied by others equally interested with themselves, and with equal rights.

If it were otherwise, and the organization and use of the franchise for one year, under such circumstances, proved the existence of the district, any body of men could organize themselves and form a district, in spite of any authority whatever, and one district might exist within another.

In this case, districts Nos. 6 and 3 were as much organized, as much enjoyed the franchise and privileges of a district as the union district. So, if defendant's proposition is true, there are in Dresden three districts, Nos. 6 and 3, and another, composed of those two.

But this exercise of franchise is mere presumption of organization, and not conclusive proof. In this case, we have the proof of the union, or, rather, want of union, and, of course, there is no occasion to resort to presumptions.

Next comes, as a sort of cure-all, the Act of March 19th, 1858. This, however, purports to cover only a part of the ground, simply making valid other doings of each district by itself. It does not make or purport to make valid any thing more than the proceedings of the meeting of No. 6, Sept. 23, 1852, and of the meeting of No. 3, Jan. 9, 1856; leaving the town records still defective, and the meetings themselves as inadequate as ever, as unconcurrent in their action as before the law.

But, it is respectfully contended that this law is null and void, if it accomplishes the union of the districts. It is retrospective, and interferes with the vested rights and proper-

ty of this plaintiff. The law was passed after the levy was made and after the action was commenced. If then, at the time of the levy, these districts were not united, the property taken belonged to the plaintiff, and, after it was taken, he had a claim upon the defendant for its value, which was really property.

But this law interferes, and not only takes away all remedy for that trespass, but actually takes away the claim itself. Before the law the property was his, after the law it was not his. Before it his property was wrongfully taken, after it the same taking was made right. *Proprietors of Kennebec Purchase* v. *Laboree & als.*, 2 Maine, 275.

It is also unconstitutional, if it is to have the effect claimed for it, because it is a special law exempting certain corporations from the effect or requirements of a general law. By the law of 1852, districts are authorized to unite for certain purposes and by a certain course of proceedings. This law, if it unites these districts, exempts them from the requirements of that law and says these two districts shall be united without such proceedings. 3 Maine, 326; 4 Maine, 140.

There is an objection to the act of the defendant, showing his levy without authority, even on the ground of the union of the two districts. That union never was consummated by an organization. The records, alleged to be the records of the union district, are fatally defective, but, more especially, do not apply to any such district. So far as they describe any district, it is that of No. 6. Now the union district never was legally known by any such name. The law of 1852 provides that the new district shall be known by such name as the inhabitants thereof may designate. If that applies to the inhabitants of the new district, as we suppose, it does not appear that any such name as that in the execution was ever adopted. If it applies to the inhabitants of the two districts, acting separately, then it has never been adopted, at least, by one of them, that of district No. 6, for the records of their meeting show no action whatever upon the subject. So that there was no district in the town of Dresden such as is de-

scribed in the execution, under which the defendant justifies, other than the original No. 6, established by the town in 1826, and of that the plaintiff never was an inhabitant, and defendant took his property without any authority.

*Gould*, for defendant.

The principal question for decision in this case is, were school districts Nos. 3 and 6, in Dresden, in any mode consolidated, so as to form one district on the 20th day of June, 1857? Did there on that day exist such a district as *No. six*, of which the plaintiff was an inhabitant? We prove this fact in several ways:—

(1st.) By the concurrent action of the old districts 3 and 6.

(2d.) By the " exercise of the franchise and privileges of a district for the term of one year," before that time.

(3d.) By the direct intervention of the Legislature.

1. "In the proceedings of our various and numerous municipal corporations, we ought not to look for a scrupulous observance of the most approved formalities. If their proceedings are in substance what they should be, and intelligible, it would be *mischievous* to set them aside for want of technical formality." *Soper* v. *School district in Livermore*, 28 Maine, 193, 203–4; Angell & Ames on Corp. § 5, Int.

Proceedings of *school districts*, like the proceedings of towns, " should receive a *liberal construction*, that they may, if possible, be supported." *Whitmore* v. *Hogan*, 22 Maine, 564, 567.

The union of districts Nos. 3 and 6 was formed under the law of 1852, c. 243.

The first objection made is, that *that* statute is unconstitutional.

This objection has not impressed itself upon any of the Legislatures since 1852, nor upon the learned commissioners who revised the statutes, as the law is retained in the new code of 1857, c. 11, § 26.

The plaintiff's argument proceeds upon the ground, that it is incompetent for the Legislature to incorporate a certain portion of the territory of a *town* into a school district; that,

by the Act of incorporating a town, the Legislature irrevocably *cedes* to the town all its power, in respect to the organization of the territory for school purposes. If this were so, there is a large class of legislative Acts, running through the whole history of the State, which contravene the constitution.

It has always been considered, that the Legislature might go *much further* than this; that shool districts and other *geographical portions* of towns might be invested with the power of *self taxation* for local purposes, independent of the action of the town. See the çase of *Smyth* v. *Titcomb*, 31 Maine, 272, and authorities cited by Howard, J., on p. 286.

Geographical portions of towns, it has been repeatedly held, may be incorporated for the purpose of mutual protection against *fire* and other local interests, as well as for religious and educational purposes; and such legislative Acts have been regarded, not only as *constitutional*, but among the most useful class of enactments.

The *modus operandi*, creating union districts, is analogous to that authorized in the statutes for creating corporations for religious purposes, parishes and religious societies, in which authority is delegated to them to *organize themselves* into a corporation, with all the usual powers of such bodies; to hold property, build churches, support preaching, &c., &c. This mode of creating corporations has been long recognized, by courts and Legislatures, as competent.

In this càse, we have no occasion to go any further than to consider whether a corporation may be *created*, by the joint action of two districts, under a statute authorizing it. Though we might do so with safety, we have no occasion to contend that it would have an independent power of taxation.

The general rule is, that " the Legislature has *entire control* over municipal corporations, to create, change or *destroy* them at pleasure." *The People* v. *Wren*, 4 Scam. 269.

I apprehend that there is no such thing as the Legislature "exhausting its power" on these subjects, as is contended by plaintiff. The legislative power over the territory of a town is as much unlimited *after* as *before* the Act of incorporation.

No vested *indefeasible* rights are granted to towns by their incorporation. Certainly not upon this subject.

It is also said, that the Act of 1852 was *repealed* by the Act of 1854, by necessary implication. This is not so, as will be perceived by an examination of the two Acts. If there is *any* incompatibility in those Acts, it is only between the *third* section of the Act of 1852, and the *first* section of the Act of 1854, (c. 104.)

There is nothing in the law of 1854 incompatible with the 1st and 2d sections of the Act of 1852. Under that Act, two or more school districts might still be *united;* though, perhaps, under the 1st section of the Act of 1854, the town might again *divide* it; the union would stand well so long as the town did not *interfere.* This is the *strongest* view that can be taken for the plaintiff.

But the Legislature of 1857 did not understand that there was even *this* incompatibility in the two Acts, for they retain *both* in the R. S., c. 11,— viz., the Act of 1854 in § 1, and the Act of 1852 in § 26.

2. The union district No. 6 had " exercised the franchise and privileges of a district, for the term of one year" and *more,* before the levy by defendant; and it is therefore " to be presumed to have been legally organized;" or, in the language of the marginal note in the statute, to be " *deemed*" to be legally organized. Stat. 1850, c. 193, art. 11, § 3, retained in R. S., c. 11, § 15.

This is not singular legislation. There have always been Acts upon the statute books of this State of *similar* character. The laws of 1821, c. 117, § 7, provided that all school districts then existing should be bodies corporate, &c. This was held, in *Whitmore* v. *Hogan,* 22 Maine, 566, " to embrace *all districts,* as well those existing only *de facto,* as those created *by a legal vote of the town.*" And it is further there said, that the statute was *intended* to embrace those districts which could not prove " a strictly legal existence."

In 1850, the Legislature thought it wise, for the purpose of preventing trouble and injury to the cause of education, by

some captious tax payer, who might be disposed to be hyper-critical in his scrutiny of the doings of school districts, to pass a sort of "limitation Act," or an Act "to quiet titles." I submit that this statute did not design to make the "exercise of the franchise and privileges of a district "*prima facie* evi-dence of organization, merely. It is *conclusive,* certainly, as regards *strangers,* like defendant, who have occasion to deal with them.

The law under consideration, in *Tucker* v. *Wentworth,* 35 Maine, 393, cited by plaintiff, was not like the one now in question, which was for the first time enacted in 1852. The Act of 1847 did not contemplate a permanent union. The decision has no bearing on this case. By the Act of 1852, districts thus united became a " body corporate," &c.

What are the "*franchise and privileges* of a school district," but those which this union district is proved to have exercis-ed and enjoyed? Their records are before the Court. By them it appears that the district undertook to organize the territory of old districts 3 and 6 into a *school district,* March 22, 1856; that, from that day until this action was tried, the organization, with the proper officers, has been kept up, meet-ings, annual and others, have been held, school house built, schools kept, land purchased, schools *graded,* &c., &c., doing all those acts, indeed, which are common to school districts.

3. That, if any defects existed in the proceedings of the districts, which were had for the purpose of uniting them into one district, they were cured by the Act of the Legislature, passed for that purpose, approved March 19, 1858. The Acts confirmed take effect as of the time when done, not when confirmed. Counsel cited, on this branch of his argument, *Walter* v. *Bacon,* 8 Mass. 472; *Patterson* v. *Philbrook,* 9 Mass. 151; *Locke* v. *Dana,* 9 Mass. 363; *Wilkinson* v. *Leland,* 2 Peters' R. 627; *Inhabitants of Lewiston* v. *Inhabitants of Yar-mouth,* 5 Maine, 66.

*Morrill* replied.

The opinion of the Court was drawn up by

RICE, J. — The act complained of by the plaintiff, as a trespass upon his rights, was performed by the defendant, in his official capacity as sheriff of the county of Lincoln. That the defendant was, in fact, sheriff of said county, and duly qualified to act in that capacity, is admitted. It is also admitted that his proceedings, in seizing and selling the property of the plaintiff, were regular in form, and according to the rules prescribed by law. Nor is there any complaint that the tax, on which the property of the plaintiff was seized, was not, so far as the proceedings of the constituted authorities were concerned, assessed according to the forms prescribed by the statute. The objections of the plaintiff lie deeper. He denies the legal organization, or existence of the school district, for the benefit of which the tax was assessed, and consequently the right to assess the tax in any form, or to collect the same of him by any process whatever.

In 1826, the town of Dresden established school districts Nos. 3 and 6, in that town. The plaintiff, at the time of the levy of the tax, for the collection of which his property was sold by the defendant, resided within the territory originally included in district No. 3, and had resided there for ten years prior to the date of the acts complained of.

By certain acts of the two districts, 3 and 6, had in 1852 and 1856, and by the town of Dresden, it is contended by the defendants those districts became united in one, by the name of district No. 6, under the provisions of the Act of 1852, c. 243, with all the rights and subject to all the duties and liabilities of school districts organized by virtue of that Act. This result is denied by the plaintiff, for the reason that the Act itself is unconstitutional, and that the proceedings of the districts and of the town were irregular, informal and void.

By art. 8 of the constitution, it is provided that, "the Legislature are authorized, and it shall be their duty, to require the several towns to make suitable provision, at their own expense, for the support and maintenance of public schools."

Admonished by this specific requirement of the constitution, the Legislature have, from time to time, enacted laws requiring towns to make provision for the support and maintenance of public schools at the expense of such towns, and among other acts for the accomplishment of that object, it has authorized towns to divide the territory thereof into school districts. This power was, as has been seen, exercised by the town of Dresden, in 1826.

It is contended by the plaintiff that the Legislature, having once conferred this authority upon the towns, has exhausted its powers upon the subject, and therefore could not legitimately authorize districts, within a town, to unite, without the consent of the town for that purpose.

On examination, no such limitation on the power of the Legislature, will be found in this section of the constitution. It authorizes the Legislature to require towns to make suitable provision for the *support* and *maintenance* of public schools at their own expense. That is, the towns must provide means, in the way of funds suitable and necessary for the support and maintenance of public schools within their limits. And, because towns have, under this provision of the constitution, been required to do certain things for the support of public schools therein, it does not follow that nothing further can be done by the Legislature in the same direction and for the same general purpose. The construction contended for would not only compel towns to make suitable provision for the support and maintenance of schools, by raising money for the payment of instructors and other incidental expenses, but would also compel them to construct all the school houses and pay all the other expenses of our public schools, which are now, by law, imposed upon school districts. In fact, it would amount to a total abrogation of school districts as corporations.

The powers of our Legislature are not thus limited by the constitution.

By sect. 1, art. 4, the Legislature have full power to make and establish all reasonable laws and regulations for the

defence and benefit of the people of this State, not repugnant to this constitution, nor to that of the United States.

No repugnancy is perceived between these two provisions of the constitution. They harmonize together; the provision in the 8th article being only a specific requirement upon the Legislature, to exercise a portion of the general power conferred by the 4th. It is not a limitation of the general power, but a requirement that, for the specific purpose therein named, it shall be exercised.

It is further contended that, if the law of 1852 is not in violation of the constitution, it has been repealed by the Act of 1854, c. 104, § 1, which provides that the inhabitants of every town, at their annual meeting, may determine the number and limits of school districts within such towns, and, if necessary, may divide or discontinue any such districts, and, in its concluding section, repeals all Acts and parts of Acts inconsistent therewith.

The provisions of the Act of 1854 are manifestly inconsistent with the third section of the Act of 1852, c. 243, which provides that, after two or more school districts shall have united, as provided for in the foregoing sections of this Act, the town in which such districts are situated shall not have power to alter or divide the same, without the consent of a majority of the voters of such district.

Under the Act of 1854, it is competent for the inhabitants of towns to divide or alter the limits of school districts, however formed, under the general laws of the State. Under the law of 1852, it was not competent for towns to alter the lines of districts which had united under the provisions of that Act. No other inconsistency between the two statutes, so far as this case is concerned, is perceived.

It is further contended that, should the objections which we have already considered, not prevail, still there were irregularities and informalities in the acts of the districts, which render the attempted organization of the new district wholly nugatory. Those irregularities and informalities have been pointed out with much distinctness and precision, by the coun-

sel for the plaintiff. As the law stood prior to 1850, we are of the opinion that some of the objections taken to this part of the proceedings might have been deemed fatal to the legality of that organization. They are, however, technical in their character, and do not go to the merits of the case, so far as the evident intention of a majority of the inhabitants of the districts were concerned.

The object sought to be attained, by those in favor of union, was laudable and highly creditable to them. It betokens an enlightened sentiment and a commendable public spirit, which deserves encouragement, so far as is consistent with a fair and just administration of the law.

It was evidently the intention of the Legislature to meet objections of this precise character, which had been upheld by a strict and rigid rule of judicial construction, that the provisions of § 3, art. 2, of c. 193, of laws of 1850, were inserted in that Act. The section reads as follows:—.

"Every school district shall, in all cases, be presumed to have been legally organized, when it shall have exercised the franchise and privileges of a district for the term of one year."

It is true, as contended by the plaintiff, the statute does not say that this presumption shall be *conclusive.* Nor is it necessary that it should be so. Such a provision might exclude the right to show that the union had been procured by fraudulent and corrupt practices, which, of course, should not be encouraged or sustained in any case. But the presumption arising by force of that statute is sufficient to overcome the informalities, which are mostly of a negative character, disclosed by the records in this case, after the new district has exercised the franchise and privileges of a district for the term of one year, as was the case here, before the proceedings, of which complaint is made, were had. As this will determine the case, it is not necessary to consider the other points made by counsel.        *Plaintiff nonsuit.*

TENNEY, C. J., and APPLETON, CUTTING, MAY, and GOODE-NOW, J. J., concurred.